JUDGE SULLIVAN

'09 CIV 00557

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK



RECEIVED
JAN 2 0 2009
U.S.D.C. S.D.N.Y.
CASHIERS

| | |
|---|---|
| CHÂTEAU FIDUCIAIRE S.A. as TRUSTEE of THE MAP TRUST, on Behalf of Itself and all Others Similarly Situated,<br><br>                  Plaintiff,<br><br>      v.<br><br>ARGUS INTERNATIONAL LIFE BERMUDA LIMITED, ARGUS GROUP HOLDINGS LIMITED, MASSACHUSETTS MUTUAL LIFE INSURANCE CO., OPPENHEIMER ACQUISITION CORPORATION, RYE INVESTMENT MANAGEMENT, RYE SELECT BROAD MARKET FUND L.P., RYE SELECT BROAD MARKET INSURANCE PORTFOLIO, LDC, TREMONT [BERMUDA] LIMITED, TREMONT CAPITAL MANAGEMENT INC., TREMONT GROUP HOLDINGS, INC., TREMONT INTERNATIONAL INSURANCE LIMITED, and TREMONT PARTNERS INC.,<br><br>                Defendants. | CIVIL ACTION NO. _____<br><br>JURY TRIAL DEMANDED<br><br>CLASS ACTION COMPLAINT |

Plaintiff Château Fiduciaire S.A. as Trustee of The Map Trust (the "Map Trust" or "Plaintiff"), on behalf of itself and a Class (defined below), alleges upon the investigation made by and through its counsel, complaints filed by the United States Government and Securities and Exchange Commission (the "SEC"), reports and interviews published in the financial press, and information obtained by Plaintiff, as follows:

Dockets.Justia.com

# I.    SUMMARY OF ACTION

1.    This is a class action on behalf of all persons, other than defendants, who purchased or held variable universal life insurance ("VUL") policies offered by defendant Argus International Life Bermuda Limited f.k.a. Tremont International Life Insurance Limited from January 2003 until the present (the "Class Period") to recover damages caused by defendants' breaches of fiduciary duties.

2.    This action arises out of the $50 billion dollar Ponzi scheme orchestrated by Bernard L. Madoff ("Madoff"). Rather than paying his investors returns on their investments, Madoff was secretly paying certain investors returns using the principal he received from other investors.

3.    On December 11, 2008, Madoff's fraud was exposed and the Securities and Exchange Commission ("SEC") charged both Madoff and his investment firm Bernard L. Madoff Investment Securities LLC ("BMIS") with securities fraud. Criminal charges were also filed against Madoff. When he was arrested, Madoff was quoted as saying "there is no innocent explanation" for what had happened and that he "paid investors with money that wasn't there." Madoff admitted that BMIS was insolvent and had been for years.

4.    Madoff was unable to perpetrate this fraud on his own. Numerous funds of funds (FOF), investment advisors, and affiliates, including the defendants, facilitated Madoff's fraud by investing and allowing to be invested billions of dollars of their clients' money with Madoff and his related entities without performing adequate due diligence despite the existence of "red flags." The red flags included, among others, the abnormally high and stable positive investment results reportedly obtained by Madoff regardless of market conditions; inconsistencies between BMIS's publicly available financial information concerning its assets and the purported amounts that Madoff managed for clients; and the fact that BMIS was audited by a small, obscure

accounting firm with no experience auditing entities of the apparent size and complexity of BMIS. These red flags should have alerted the FOFs that Madoff's returns were suspiciously aggressive despite the performance of the overall market. Despite having failed to perform due diligence, these FOFs, investment advisors and affiliates were paid large management and advisory fees by their clients, often for doing little other than simply handing over their funds to Madoff or his related entities.

5.     Defendants here acted with gross negligence, recklessness and/or in breach of fiduciary duties owed to Plaintiff and other Class members, and caused and/or permitted Plaintiff and other class members to choose improper and inappropriate investments that have decimated the variable investment account component of their VULs, and, most egregiously, placed these VUL policies at risk of lapsing.

6.     Plaintiff seeks to recover damages caused to the Class by defendants' breaches of fiduciary duties, and to protect the VULs, and the associated death benefits, from premature lapsing.

## II.     JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2)(B) and has supplemental jurisdiction pursuant to 28 U.S.C. 1367.

8.     Venue is proper in this District pursuant to 28 U.S.C. §1391(a) because a substantial part of defendants' conduct giving rise to the claims herein have occurred within this District. Additionally, defendants maintain their headquarters or conduct substantial business in this District.

## III.     PARTIES

9.     Plaintiff, The Map Trust, is a foreign discretionary trust set up on or before February 1997 for the benefit of the children of the late David Fine, including Mark Fine. In

2000, The Map Trust purchased a VUL policy on the life of Mark Fine with an initial premium of $345,262 and a minimum death benefit of $6,360,000. On or about December 21, 2006, Château Fiduciaire S.A., a Swiss entity, was appointed Trustee of The Map Trust.

10. Defendant Argus International Life Bermuda Limited ("Argus International" or the "Insurer"), formerly Tremont International Insurance Limited ("Tremont International"), is a Bermuda-based and incorporated insurance company established to write offshore life insurance products such as variable annuities and variable life policies. Tremont International was originally a subsidiary of Tremont Capital Management Inc. In February 2007, it was purchased by Argus Group Holdings Limited and its name was changed to Argus International. Tremont International issued and Argus International maintains the VUL policy purchased by Plaintiff. Defendant Argus International is located at 12 Wesley Street, Hamilton, Bermuda.

11. Defendant Argus Group Holdings Limited and its subsidiaries, commonly known as the "Argus Group," is a multi-line insurance and financial services organization offering a full range of insurance, pension and investment products targeted at local and international businesses as well as individuals. Argus Group is traded on the Bermuda stock exchange and is located at 12 Wesley Street, Hamilton, Bermuda. Argus Group is the parent of Argus International and is Bermuda's largest locally owned insurance company. Argus International and Argus Group are sometimes collectively referenced as "Argus."

12. Defendant Tremont International Insurance Limited is a Bermuda-based and Cayman Islands incorporated insurance company established to write offshore life insurance products such as variable annuities and variable life policies. Tremont International was originally a subsidiary of Tremont Capital Management Inc. In February 2007, it was purchased

by Argus Group Holdings Limited and its name was changed to Argus International. Tremont International issued the VUL policy purchased by Plaintiff.

13. Defendant Tremont Capital Management Inc. ("Tremont Capital"), formerly known as Tremont Advisers Inc., is a manager of fund of hedge fund portfolios. It is a unit of Tremont Group Holdings, Inc. and was the parent of Tremont International until its sale to Argus Group in 2007. Tremont Capital provides investment services to Argus VUL policyholders pursuant to its relationship and contractual agreements with Argus. Tremont Capital is located in this Judicial District at 555 Theodore Fremd Avenue, Rye, New York, 10580.

14. Defendant Tremont [Bermuda] Limited ("Tremont Bermuda"), a wholly owned subsidiary of Tremont Capital, and its principal foreign subsidiary, is based in Hamilton, Bermuda and provides investment advisory services to several multi-manager offshore funds. It also acts as the fund sponsor, and, in some cases, administrator, for a select group of offshore funds managed by U.S. based money managers affiliated with Tremont Group Holdings, Inc. Tremont Bermuda is located at Tremont House, Four Park Rd., Hamilton, Bermuda.

15. Defendant Tremont Group Holdings, Inc. ("Tremont Group") is an investment manager of fund of hedge funds products and multi-manager portfolios. According to its website, Tremont Group "has been at the forefront in setting the standard in the industry for fund of hedge funds investment management. Effective investment strategies and oversight, thorough manager research, careful due diligence, advanced risk allocation and time-tested portfolio management form the cornerstones of a comprehensive platform that has been refined over a 23-year span of dedicated strides to maximize our clients' objectives." Tremont Group is the parent of Tremont Capital and Tremont Partners Inc. and is located in this Judicial District at 555 Theodore Fremd Avenue, Rye, New York, 10580.

16.     Defendant Tremont Partners Inc. ("Tremont Partners") is a subsidiary of Tremont Group that manages and/or serves as General Partner of several of the Tremont Group affiliated funds. Tremont Partners is located in this Judicial District at 555 Theodore Fremd Avenue, Rye, New York, 10580.

17.     Rye Investment Management ("Rye") is the division within Tremont Group that manages, sells, and administers the firm's select manager funds — the Rye Select Funds. Rye is located in this Judicial District at 555 Theodore Fremd Avenue, Rye, New York, 10580. Rye, Tremont International, Tremont Bermuda, Tremont Group, Tremont Partners and Tremont Capital are sometimes collectively referenced as "Tremont."

18.     Rye Select Broad Market Fund L.P. is a Delaware limited partnership organized in May 1994 and managed by Rye. It was formerly known as the Tremont Broad Market Fund. Tremont Partners is the General Partner of the Rye Select Broad Market Fund L.P. The Rye Select Broad Market Fund L.P. was one of the investment fund options offered to VUL policyholders. The Map Trust had an investment in the Rye Select Broad Market Fund L.P. in its variable account during the life of its policy. Rye Select Broad Market Fund L.P. is located in this Judicial District at 555 Theodore Fremd Avenue, Rye, New York, 10580.

19.     Rye Select Broad Market Insurance Portfolio, LDC is a Bermuda-incorporated limited duration company managed by Tremont Bermuda. Tremont Bermuda delegated all its managerial duties to Tremont Advisers, Inc. The Rye Select Broad Market Insurance Portfolio, LDC was one of the investment fund options offered to VUL policyholders. The Map Trust had an investment Rye Select Broad Market Insurance Portfolio, LDC in its variable account during the life of its policy. Rye Select Broad Market Insurance Portfolio, LDC is located in this Judicial District at 555 Theodore Fremd Avenue, Rye, New York, 10580.

20. The Rye Select Broad Market Fund L.P., Rye Select Broad Market Insurance Portfolio, LDC and other Rye affiliated funds offered as investment fund options to VUL policyholders are collectively referred to herein as the "Rye Funds."

21. Defendant Oppenheimer Acquisition Corporation ("Oppenheimer") is a business that specializes in investment advisory services. Oppenheimer's headquarters are located in this Judicial District at 2 World Financial Center, New York, New York 10281. Oppenheimer acquired Tremont Group in 2001.

22. Defendant Massachusetts Mutual Life Insurance Co. ("MassMutual"), which is located at 1295 State Street Springfield, Massachusetts 01111-001, is the parent company of Oppenheimer. MassMutual is a mutually owned financial protection, accumulation and income management company and is a member of FINRA and SIPC.

23. Defendants Argus, Rye, Rye Funds, Tremont, Oppenheimer, and MassMutual are sometimes referred to herein collectively as the "Defendants."

24. Each of the Defendants is liable for breaching its fiduciary duties owed to Plaintiff and the Class and/or for aiding and abetting those fiduciary duty breaches by their recklessness, negligence and/or failure to act to prevent the deceit perpetrated upon the Class.

## IV. PLAINTIFF'S CLASS ACTION ALLEGATIONS

25. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of all those who purchased or held VUL policies from Argus during the Class Period and who suffered damages thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Defendants, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

26.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Members of the Class may be identified from records maintained by Defendants and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

27.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class invested the "Investment Account" portion of their VUL policies in one or more of the Rye Funds or similar funds managed by Tremont and sustained damages due to the Defendants' breaches of fiduciary duties that are complained of herein.

28.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

29.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

        a.     whether Argus breached its fiduciary duties to Plaintiff and the Class by failing to conduct adequate due diligence when making Tremont managed funds available as an investment option for VUL policyholders;

        b.     whether Defendants' conduct alleged herein was intentional, reckless, or grossly negligent or in violation of fiduciary duties owed Plaintiff and the Class and therefore violated the statutory and common law of New York;

        c.     whether Defendants aided and abetted the breaches of fiduciary duties by Argus and Tremont; and

d.    to what extent the members of the Class have sustained damages and the proper measure of damages.

30.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## V.    SUBSTANTIVE ALLEGATIONS

31.    Variable universal life insurance is a type of life insurance, first offered in the late-1980's, that enjoys special tax advantages under the United States Internal Revenue Code and allows a policy holder to build a cash value that can be invested in a choice of separate accounts, similar to mutual funds. The number and type of investment choices available is dependent on the insurer. The cash value in these policies is able to earn investment returns without incurring current income tax as long as it meets the definition of life insurance and the policy remains in force. The tax free investment returns can be used to pay for the costs of insurance inside the policy.

32.    The "variable" component in the name refers to the ability to invest in separate accounts whose values vary because they are invested in the financial markets. The "universal" component in the name refers to the flexibility the owner has in making premium payments. The premiums can vary in a given month up to maximums defined by the Internal Revenue Code for life insurance.

33.    Under a VUL policy, the death benefit is the face amount of the policy plus the build up of any cash value that occurs (beyond any amount being used to fund the current cost of

insurance). As long as there is sufficient cash value to pay the costs of insurance in the policy, the death benefit will be paid. Additionally, tax-free policy loans to the policyholder (which would be paid off on death by the death benefit) are available from any excess cash value.

34.     VUL policies allow the policyholder a great deal of flexibility in choosing how much premium to pay for a given death benefit. To maintain a death benefit guarantee a specified premium level must be paid every month. To keep the policy in force typically no premium needs to be paid as long as there is enough cash value in the policy to pay that month's cost of insurance.

35.     The disadvantages of the VUL over other forms of life insurance policies are:

- that it is typically more costly than a straight life insurance policy;

- if a policy does not have the right amount of funding, it may lapse; and

- because the variable accounts in the VUL may be invested in stocks and bonds, the policyholder, rather than the insurance company, takes on the investment risk.

36.     The combination of an increasing death benefit, flexible premiums, tax-free loan availability and advantageous tax treatment of investment earnings make these policies attractive to policyholders, especially those in a high tax brackets as the tax savings alone may compensate for the higher costs.

37.     In the mid-1990's, sensing an opportunity to cater to an affluent client base, Tremont Capital established Tremont International to write offshore life insurance policies, specifically variable life insurance policies. These policies were marketed to individuals with a net worth of at least $1 million and annual income exceeding $200,000.

38.     For Tremont, the benefits of an offshore insurance license include:

- low interventions on the part of authorities and institutions;

- lower capital requirements than in the case of domestic jurisdictions;

- tax aspects: they are often exempted from all forms of direct taxes;

- tax on profits that are replaced with lump-sum taxes;

- low establishment fees;

- low license fees;

- liberal requirements connected with the operation of the insurance company;

- offshore insurance companies often are not subject to foreign exchange restrictions;

- easily available licenses in a number of offshore jurisdictions;

- no obligation of capital adequacy maintenance in a number of countries; and

- possibility of concluding all types of insurance policies, including life policies.

39. Organized under the laws of the Cayman Islands and based in Bermuda, Tremont International was able to draw on the resources of Tremont and offer for investment funds managed by and affiliated with Tremont, including the Rye Funds.

40. In July 2000, The Map Trust obtained a VUL policy from Tremont International with an initial death benefit of $6,360,000 and initial annual premium of $345,262. Substantial further sums were paid periodically so that the VUL policy had a reported cash value exceeding $2.6 million as of August 2008. The minimum annual premium for this policy was $100,000.

41. The policy stated that, "currently you can select any of the Investment Accounts. However, we reserve the right to limit this in the future." According to the initial policy documents, The Map Trust initially selected the Tremont Broad Market Fund for its investment

account.  Later policy statements show that The Map Trust held Rye Select Broad Market Insurance Portfolio, LDC in its investment account.  The policy states in pertinent part:

### SECTION VI – VARIABLE ACCOUNT PROVISIONS
### B.  Investments of the Variable Account

The Variable Account is segmented into Investment Accounts. Premiums applied to the Variable Account are allocated to an Investment Account of the Variable Account.  The assets of the Investment Accounts are invested in an underlying Investment Fund or Funds.  The Investment Accounts available on the Issue Date are shown on the Data Pages.  The Insurer may, from time to time, add additional Investment Accounts or delete Investment Accounts.  Any change in investment selection shall be pursuant to a duly executed change form filed with the Insurer at the Service Office.  The Policyowner may be permitted to transfer Cash Values to the additional Investment Accounts.  However, the right to make any transfer will be limited by the terms and conditions imposed by the Insurer.

If shares of, or beneficial interest in, any of the Investment Funds become unavailable for investment by the Investment Account, or the Insurer deems further investment in these shares or interests, inappropriate, the Insurer may limit further investment in the shares or interests, or may substitute shares or interests of another Investment Fund for shares or interests already purchased under this Policy.

42.     Despite having the discretion to deem investments "inappropriate" for its policyholders and the presence of numerous red flags concerning Madoff's fraudulent scheme, during the Class Period the Insurer never deemed the investments in the Rye Funds to be inappropriate investments for policyholders even though it knew the funds' assets ultimately were invested in one investment advisor, Madoff, which was not disclosed to policyholders.  In fact, the Insurer, originally an entity owned by Tremont, breached its fiduciary duties to Plaintiff and the Class and failed to perform even the most rudimentary analysis of the suitability of the investment funds it offered to policyholders.

43. In February 28, 2007, in a letter to policyholders, Argus announced that it acquired the Insurer but stated that it is "continuing with our relationship with Tremont Capital Management for investment management services."

44. Neither Argus nor Tremont exercised the requisite due care they owed to Plaintiff and the Class, and both concealed from Plaintiff and the Class that Tremont had abdicated its fiduciary obligations and blindly entrusted the majority of the assets in the Rye Funds to Madoff, BMIS and other Madoff-related entities with no oversight while receiving substantial fees purportedly to oversee these investments.

45. As would later be revealed, Rye had $3.3 billion, virtually all of its assets under management, invested with Madoff. Tremont Capital had another $200 million invested in Madoff. According to filings with the SEC, at the time of its acquisition by Oppenheimer, Tremont had more than $250 million in life insurance policies in force and managed $1.5 billion of client assets in its proprietary funds.

46. The VUL policy provides:

**SECTION II – GENERAL PROVISIONS**
**Q. Termination**

All coverage under this policy shall terminate when ... the following occurs:

* * *

The Net Cash surrender Value is insufficient to pay the Cost of Insurance and any other applicable charges and a sufficient premium payment or repayment of loan is not made within the grace period.

**R. Maximum Net Amount at Risk**

The Maximum Net Amount at Risk for the Policy is shown on the Data Pages. If the Policy's Net Amount at Risk exceeds this Maximum, the Insurer reserves the right to reduce the Death Benefit and make any appropriate surrender of Policy Values or

return premiums in order to reduce the Net Amount at Risk below the Maximum Net Amount at Risk.

**SECTION IV – PREMIUM PROVISIONS**
**B. Nonpayment of Premium**

If no premiums are paid after the initial Premium, insurance coverage under this Policy will continue in force as long as sufficient Net Cash Surrender Value exists to pay the Insurer's Charges, the Cost of Insurance Charges, and any other applicable charges.

47.     Under the policy, the policyholder was charged by the Insurer a periodic fee based on the policy's cash value (the "Insurer's Charge"). According to the policy, the Insurer's Charge was calculated as "1/12 of 0.85% times the Policy's Cash Value before all other charges as of the last Business Day of a month corresponding to a Valuation Date, prorated for any partial month."

48.     Argus and Tremont International were content to collect their respective fees and, rather than jeopardize this income stream, failed to perform the necessary due diligence required to meet its fiduciary obligations due Plaintiff and the Class.

49.     According to *Bloomberg News*, Tremont, in turn, "sold Madoff-managed investments since 1997 under the Rye Select Broad Market name, charging 2 percent of assets."

50.     Yet, Tremont, in breach of its fiduciary duties, failed to conduct even the most rudimentary due diligence on Madoff and instead relied on the "reputation" of Madoff without conducting any investigation of the *bona fides* of Madoff and his operation, and/or an analysis of the trading strategies and investment returns reported by Madoff, which remained suspiciously and consistently high even during adverse market conditions.

51.     Defendant Tremont, as the manager and general partner of the Rye Funds, utterly failed to supervise, monitor and manage the investments of the Rye Funds, in violation of its fiduciary duties under the laws of New York and contrary to any representations and undertaking

that it as the manager and general partner was exercising ultimate responsibility for the management, operations and investment decisions made on behalf of the Rye Funds and that notwithstanding potential conflicts of interest, that it and its affiliates were providing investment management services in a manner that is consistent with their respective fiduciary duties.

52.     Defendant Tremont acted with knowledge that it abdicated responsibility for the management of virtually all of the investment assets of the Rye Funds to Madoff, and with gross negligence in failing to perform or cause to be performed appropriate due diligence that would have revealed material irregularities in the investments, operations and financial reporting of Madoff.

53.     Defendants Argus and Tremont either knew of or recklessly disregarded: (a) the concentration of the Rye Fund's investments in a single third party investment manager, Madoff; (b) the materially heightened risk to the Rye Fund's assets from such reliance on Madoff, particularly given the lack of transparency of Madoff's operations; (c) the abnormally high and stable positive investment results reportedly obtained by Madoff, (d) the inconsistency between BMIS's publicly available financial information concerning its assets and the purported amounts that Madoff managed for clients such as Tremont and; (e) the fact that BMIS itself was audited by a small, obscure accounting firm, Friehling & Horowitz, which has its offices in Rockland County, New York and had no experience auditing entities of the apparent size and complexity of BMIS.

54.     Unlike Defendants, other investment advisors who conducted due diligence on Madoff and ran even the most simplistic models testifying the validity of Madoff's results recognized the fraudulent irregularities with Madoff's investments with ease. For example, the financial press reported that Robert Rosenkranz of Acorn Partners, an investment advisor for

high net individuals, conducted due diligence on Madoff and found it very likely that the BMIS account statements were generated as part of a fraudulent scheme. Mr. Rosenkranz reached this conclusion based, *inter alia*, on the abnormally stable and high investment returns claimed by Madoff as well as the inconsistencies between customer account statements and the audited BMIS financial statements filed with the SEC.

55. The financial press also reported that, prior to the disclosure of the massive fraud caused by Madoff, Simon Fludgate, head of operational due diligence at Aksia, another advisory firm, concluded that the stock holdings reported in the quarterly statements of BMIS filed with the SEC appeared too small to support the size of the assets Madoff claimed to be managing. The likely reason for this was revealed on December 15, 2008, when investigators working at Madoff's offices determined that Madoff was operating a secret, unregistered investment vehicle from his office.

56. Further, *BusinessWeek* reported that "managers of the Fort Worth pension fund, who first invested with Rye five years ago, started to rethink their investment in early 2008 after hiring Albourne Partners, a London due diligence firm, to assess their hedge fund portfolio. The Rye Fund raised red flags almost immediately. Albourne's managing director, Simon Ruddick, says the firm, which had long-standing concerns about Madoff's trading strategy and consistent returns, had urged clients for nearly a decade to avoid affiliated funds such as Rye. In July, the pension's board voted unanimously to dump its Rye stake."

57. Indeed, there were warning signs going back as early as 1992 that should have alerted investment professionals such as Tremont that Madoff and/or BMIS were perpetrating a massive fraud on investors.

58.    For example, in 1992, the SEC filed a lawsuit against accountants Frank Avellino and Michael Bienes, who sold $441 million in unregistered securities to 3,200 people, promising them returns of 13.5 to 20 percent, and invested the money entirely with Madoff. As a result of the SEC investigation, Avellino and Bienes agreed to shut down their business and reimbursed their clients. No action was taken against Madoff.

59.    A May 2001 article entitled "Madoff Tops Charts; Skeptics Ask How" in *MAR/Hedge*, a semi-monthly newsletter reporting on the hedge fund industry, reported that Madoff had reported positive returns for the last 11-plus years for Fairfield Sentry and other feeder funds, but that current and former traders, other money managers, consultants, quantitative analysts and fund-of-funds executives, many of whom were familiar with the so-called split-strike conversion strategy used by Madoff, questioned the consistency of the returns. These professionals noted that others using the strategy had nowhere near the same degree of success, and that Gateway, a publicly traded mutual fund, which also used the strategy purported employed by Madoff, had experienced far greater volatility and lower returns than Madoff.

60.    Further, the article reported that Madoff's strategy and trading was done by signals from a proprietary 'black box,' and that Madoff would not disclose the specifics of his firm's risk management and how it could move so much capital in and out of positions without having a major effect on the Market. The article quoted Madoff as saying "I'm not interested in educating the world on our strategy, and I won't get into the nuances of how we manage risk."

61.    On May 27, 2001 *Barron's* published an article entitled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks his investors to keep mum." As reported in Barron's, Madoff's accounts

> have produced compound average annual returns of 15% for more than a decade. Remarkably, some of the larger, billion-dollar

Madoff-run funds have never had a down year. When *Barron's* asked Madoff how he accomplishes this, he says, 'It's a proprietary strategy. I can't go into it in great detail.' Nor were the firms that market Madoff's fund forthcoming.

The article reported that some on Wall Street, including three options strategists for major investment banks, were skeptical about how Madoff achieved his double-digit returns using options alone, and told *Barron's* they couldn't understand how "Madoff churns out such numbers using this strategy."

62. The article further reported that:

The lessons of Long-Term Capital Management's collapse are that investors need, or should want, transparency in their money manager's investment strategy. But Madoff's investors rave about his performance – even though they don't understand how he does it. "Even knowledgeable people can't really tell you what he's doing,' one very satisfied investor told *Barron's*. 'People who have all the trade confirms and statement still can't define it very well; ... This investor declined to be quoted by name. Why? Because Madoff politely requests that his investors not reveal that he runs their money.

\*                  \*                  \*

What Madoff told us was, 'If you invest with me, you must never tell anyone that you're invested with me. It's no one's business what goes on here," says an investment manager who took over a pool of assets that included an investment in a Madoff fund. 'When he couldn't explain to my satisfaction how they were up or down in a particular month,' he added, 'I pulled the money out.'

63. Harry Markopolous, who reported Madoff to the SEC, summed up the peculiarity of the situation as follows:

The third party hedge funds and fund of funds that market this hedge fund strategy that invests in BM don't name and aren't allowed to name Bernie Madoff as the actual manager in their performance summaries or marketing literature. ... *Why the need for such secrecy? If I was the world's largest hedge fund and had great returns, I'd want all the publicity I could garner and would want to appear as the world's largest hedge fund in all the industry rankings.*" (Emphasis in original.)

64.     Moreover, Madoff, instead of using an outside prime broker as nearly all hedge funds do, was his own prime broker and custodian of all the assets he manages. A December 13, 2008 article in *The Wall Street Journal* quoted Chris Addy, founder of Castle Hall Alternatives, which invests in hedge funds for clients, as follows: "There was no independent custodian involved who could prove the existence of assets ... There's clear and blatant conflict of interest with a manager using a related-party broker-dealer. Madoff is enormously unusual in that this is not a structure I've seen."

65.     By failing to investigate and acting in willful blindness towards these clear red flags and the suspicious nature of Madoff's operations and investment results, Defendants were grossly negligent. If Defendants had made an appropriate inquiry underlying these red flags, that investigation would have raised questions regarding the true value and existence of the Rye Fund's reported investment assets and the suitability as an investment option to support life insurance policies.

66.     In a letter sent to policyholders on December 14, 2008, Tremont stated, "we believe Tremont exercised appropriate due diligence in connection with the Madoff investments." As described herein, this is patently untrue.

67.     On December 19, 2008, policyholders received a letter from the Rye Select Broad Insurance Portfolio, LDC stating that:

> "in consultation with Tremont (Bermuda) Limited (the "Investment Manager") and pursuant to the Fund's Articles of Association, that it is in the best interests of the Fund as a whole to declare a temporary suspension of (i) the determination of the Net Asset Value of the Fund, (ii) redemptions from the Fund those requests submitted for December 31, 2008 and thereafter and (iii) payment of redemption proceeds, due to the uncertainty associated with prior Net Asset Value calculations, which remain unpaid as of this date."

68.    On December 23, 2008, Argus's Vice President/Managing Director sent an email

to its policyholders, which stated in pertinent part:

> Dear Policyowner,
>
> We are writing to update you on the situation regarding Rye Select
> Broad Market Insurance Portfolio Fund and Rye Select Broad
> Market XL ('the Funds'), which were in turn invested in Bernard L.
> Madoff Investment Securities.
>
> The situation is evolving, with the latest news that dealing in the
> Funds has been suspended. A copy of the correspondence received
> from the Funds is attached for your information.
>
> We continue to work with our legal counsel on our options
> concerning the above. At this stage, we can confirm that our legal
> counsel has initiated communications with the Funds, requesting
> further information, and we will revert to you once that
> information has been received and considered.
>
> Regarding your life policy, in accordance with policy provisions,
> the Death Benefit will remain in place until January 31st, 2009 for
> affected policies.
>
> Early in January, we will write to affected policyowners
> individually providing an in-force illustration and available options
> for keeping the policy and associated Death Benefit in place.

69.    On January 16, 2009, Argus's Vice President/Managing Director sent an email to

its policyholders, which stated in pertinent part:

> Dear Policyowner,
>
> As previously advised in our email correspondence to you of
> January 8[th], 2009, dealing has been suspended in the Rye funds
> invested with Bernard L. Madoff Investment Securities LLC. As a
> result of this, we wrote the value of those investments down to
> zero with effect from November 30, 2008, as seen in your last
> Valuation Statement.
>
> Unfortunately, this may have caused your Policy to have a
> Negative Cash Surrender Value or will cause to do so in the near
> future. The Policy Terms and Conditions for this event are as
> follows:

*D. Grace Period*

*The Insurer may terminate this Policy if on any Processing Date, the Net Cash Surrender Value is negative. The negative Net Cash Surrender Value will be considered as an overdue charge as of such Processing Date. However, the Insurer will not terminate this Policy due to a negative Net Cash Surrender Value until the end of the grace period.*

*The grace period will end 31 days after the Insurer delivers a notice informing the Policyowner that the Insurer will terminate this Policy because of insufficient Net Cash Surrender Value.*

*To avoid termination, the Policyowner must submit a subsequent premium at least equal to the Minimum Subsequent Premium set forth on the Data Pages plus any overdue charges. This amount will be specified in the notice.*

Details of your policy's Cash Surrender Value as at December 31, 2008 can be found on the attached Policy Lapse Notice. Our calculations of your future Policy Deductions (Cost of Insurance and Administrative Fee charges), indicate that your policy will have a Negative Cash Surrender Value on **December 31, 2008**.

Based on the above, the Grace Period will begin on **December 31, 2008**, and if no further premiums are paid into your policy by **February 28, 2009**, then the policy will lapse. (Emphasis in original.)

70.     Due to Argus' negligence and inadequate oversight, the investment opportunities afforded VUL policyholders resulted in the decimation of the variable investment account component of their VULs and placed these VUL policies at imminent risk of lapsing.

71.     Plaintiff and other members of the class now find themselves without the income they believed they had accumulated over time and at acute risk of immediate loss of their death benefits.    Additionally, Plaintiff and the Class may now face unexpected and disadvantageous income tax consequences due to Defendants' actions and inactions.

## COUNT ONE

### (Negligent Misrepresentation against all Defendants)

72.     Plaintiff repeats and realleges all preceding paragraphs, as if fully set forth herein.

73. During the Class Period, Defendants, by their actions and inactions, knowingly and recklessly issued, caused to be issued, participated in the issuance of, the preparation and issuance of deceptive and materially false and misleading statements to Plaintiff and the other class members regarding the cash value of the VUL policies and continuation of the death benefits associated with the policies.

74. The Defendants owed to Plaintiff and other class members a duty: (a) to act with reasonable care in preparing and disseminating the policy statements and other representations relied upon by Plaintiff and other class members in deciding to acquire and maintain their VUL policies and/or make their respective investment choices; and (b) to use reasonable diligence in determining the accuracy of and preparing the information contained in those statements. Defendant knew that these statement reports would be provided to policyholders and would be relied on by them in making investment decisions concerning their investment accounts.

75. The Defendants breached their duties to Plaintiff and other class members by failing to investigate, confirm, prepare and review with reasonable care the information contained in these statements and other representations.

76. Neither the statements nor any other material disseminated to Plaintiff and the Class ever disclosed the risks associated with the assets invested with Madoff, BMIS or other Madoff controlled entities. As a direct, foreseeable and proximate result of this negligence, Plaintiff and other class members have sustained damages, suffered mental and emotional distress and have lost a substantial part of their respective investments in an amount yet to be determined, and to be proven at trial, and may find themselves without life insurance coverage.

77. By reason of the foregoing, Defendants are jointly and severally liable to Plaintiff and other class members.

78.     Defendants' acts were willful and wanton and Plaintiff and other class members are entitled to punitive damages.

**COUNT TWO**

**(Unjust Enrichment against Argus and Tremont)**

79.     Plaintiff repeats and realleges all preceding paragraphs, as if fully set forth herein.

80.     By their actions and inactions, Argus and Tremont have benefited and profited unjustly by receiving excessive revenue derived from the fees they collected based on the policy's cash value.

81.     These payments have been received by Argus and Tremont at the expense of Plaintiff and other members of the Class, under circumstances in which it would be inequitable for Argus and/or Tremont to be permitted to retain the benefit.

82.     Plaintiff and the other members of the Class are entitled to restitution of the excessive revenue derived from the assessment of fees based on the misrepresented cash value portion of their VUL policies.

**COUNT THREE**

**(Fiduciary Duty Breaches against Argus and Tremont)**

83.     Plaintiff repeats and realleges all preceding paragraphs, as if fully set forth herein.

84.     Argus and Tremont breached their fiduciary duties to Plaintiff and the Class by failing to conduct the requisite due diligence over the improper and inappropriate investment choices made available to Plaintiff and the Class despite numerous red flags.

85.     Despite their continuous responsibility to Plaintiff and the Class to ensure that investments in the Investment Account portion of the VULs were appropriate, and in utter disregard for due care and reasonable and prudent oversight, Argus and Tremont failed to halt

further investments in the Rye Funds and other Tremont related funds, and breached their fiduciary duties of care owed to Plaintiff and the Class.

86.     Argus and Tremont, in direct breach of their fiduciary duties, caused and allowed Plaintiff and the Class to direct their investments to funds that invested with Madoff or Madoff related entities without any oversight or supervision, causing or permitting the reckless investment practices alleged herein, failing to adequately monitor Madoff's financial reporting, and failing to detect, prevent, or halt the misstatements and omissions of material fact alleged herein.

87.     Plaintiff and the Class have suffered damages proximately caused by the fiduciary duty breaches of Argus and Tremont in an amount to be proven at trial.

88.     Argus and Tremont are further liable to Plaintiff and the Class for punitive damages, in an amount also to be determined at trial, attributable to the wanton course of conduct of Argus and Tremont that was reckless, willful and without regard to the rights of Plaintiff and the Class.

## COUNT FOUR

### (For Aiding and Abetting Against Tremont, Oppenheimer, and MassMutual)

89.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

90.     By their positions of control over Rye and the Rye Funds, Defendants Tremont, Oppenheimer, and MassMutual, participated in and/or were aware of Rye's operations, and/or had intimate knowledge of Rye's products, sales, accounting, plans and implementation thereof, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Rye, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. Defendants Tremont, Oppenheimer, and

MassMutual had the ability to prevent the issuance of the statements or cause the statements to be corrected.

91.     Defendants Tremont, Oppenheimer, and MassMutual had direct and supervisory involvement in the day-to-day operations of Rye and, given the size, scope, and blatancy of the wrongdoing and the misrepresentations alleged above, are presumed to have had the power to control or influence the particular statements giving rise to the claims alleged herein.

92.     Defendants Tremont, Oppenheimer, and MassMutual had actual knowledge of the fiduciary breaches of Argus and Tremont.

93.     Plaintiff and the Class suffered damages proximately caused by Tremont, Oppenheimer, and MassMutual aiding and abetting of the fiduciary duty breaches of Argus and Tremont in an amount to be proven at trial.

## COUNT FIVE

### (For Injunctive and Declaratory Relief)

94.     Plaintiff repeats and realleges all preceding paragraphs, as if fully set forth herein.

95.     As set forth above, through the improper practices described above, Defendants have placed the VUL policies of Plaintiff and the Class at severe risk of imminent lapsing.

96.     Defendants' practices described herein are unlawful and against public policy and, therefore, Defendants should be enjoined from terminating these VUL policies or abrogating the death benefits associated with them.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.     determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as Class Representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel;

B.     awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(a), plaintiff hereby demands a trial by jury of all issues so triable.

Dated: January 20, 2009

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP

By:_____
    Daniel W. Krasner
    Gregory Mark Nespole
    Demet Basar
    Gustavo Bruckner
    Russell S. Miness
270 Madison Avenue
New York, NY 10016
Telephone: (212) 545-4600
Facsimile:  (212) 545-4653